SECURITIES AND EXCHANGE
COMMISSION

v.

DIVERSIFIED GROWTH CORP., et al.

No. CA 81–84.

United States District Court,
District of Columbia.

April 9, 1984.

On Motion For Order of Contempt
Aug. 29, 1984.

As Amended Oct. 1, 1984.

Neil Lang, Lewis J. Mendelson, Washington, D.C., for plaintiff.

O. Jackson Cook, Atlanta, Ga., Theodore A. Howard, Washington, D.C., for Diversified Growth Corp.

# 1162

William T. Hangley, Philadelphia, Pa., Leonard C. Greenebaum, Washington, D.C., for Eastern Empire Corp.

Thomas R. Todd, Jr., Atlanta, Ga., for Fitzgerald.

## MEMORANDUM

JOHN GARRETT PENN, District Judge.

Before the Court are three motions: (1) Motion of the Securities and Exchange Commission for a Judgment Against Thomas C. Fitzgerald, Jr. Assessing Fines Previously Imposed for Failure to comply with this Court's Judgment of Permanent Injunction ("SEC motion"); (2) Motion of Defendant Eastern Empire Corporation for Order of Civil Contempt and Sanctions against Thomas C. Fitzgerald, Jr., Diversified Growth Corporation, and American Diversified Corporation ("Eastern motion"); and (3) Motion of Thomas C. Fitzgerald, Jr. for Relief from Findings, Orders, and Judgment of this Court ("Fitzgerald motion"). Upon consideration of the entire record, the Court grants the SEC's and Eastern's motions and denies Fitzgerald's motion.

*Background*

In January 1981, the Securities and Exchange Commission ("SEC") commenced this action against Diversified Growth Corporation ("DGC"), American Diversified Corporation ("ADC"), and Eastern Empire Corporation ("EEC") alleging, among other things, violations of the reporting requirements of Section 13(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78m(a), and Rules 13a–1 and 13a–13 thereunder, 17 CFR §§ 240.13a–1 and 240.13a–13. The Complaint specifically alleged that DGC, ADC, and EEC had failed to file their annual reports (10–Ks) for the fiscal years 1976 through 1979 (ADC and EEC) and 1977 through 1980 (DGC), and quarterly reports (10–Qs) for the fiscal quarters ended June 30, 1977 through September 30, 1980 (DGC) and March 31, 1978 through September 30, 1980 (ADC and EEC).[1]

On June 8, 1983, after hearing and argument, this Court entered a Permanent Injunction ("Injunction") against DGC, ADC, and EEC. The Injunction ordered, *inter alia*, DGC and ADC to file their delinquent 10–K and 10–Q reports on or before June 10, 1983,[2] to file in timely fashion all required reports in the future, and to provide EEC with all information and documents necessary to enable EEC to prepare its annual and quarterly reports.

Neither DGC nor ADC complied with the Court's Injunction. On June 18, 1983, after negotiations with the SEC's staff, DGC, ADC, and Fitzgerald consented to findings of civil contempt and entry of an order requiring the reports to be filed on or before July 15, 1983. In addition, Thomas C. Fitzgerald, Jr., the Chief Executive Officer and Chairman of the boards of DGC and ADC, consented to entry of an order imposing coercive fines of $1,000 per day on him personally should DGC and ADC fail to file the delinquent reports by the July 15 deadline. This order was entered on June 20, 1983 ("June 20 Order").

On July 15, 1983, DGC filed documents which purported to be 10–Ks for the fiscal years ended March 31, 1977 through 1983, and ADC filed documents which purported to be 10–Ks for the fiscal years ended December 31, 1976 through 1982, 10–Qs for

---

1. DGC, ADC and EEC were formerly under common control with Mr. Fitzgerald acting as Chief Executive Officer of all of the entities. Then, some time in 1981, as a result of a settlement of a shareholders derivative action, EEC became independent and under new management. EEC, although delinquent in its reports, has claimed that it is unable to file because DGC and ADC will not provide it with certain necessary documentation of financial transactions and accounts.

2. The delinquent reports which were ordered to be filed were: DGC's 10–Ks for the fiscal years ended March 31, 1977 through 1982; DGC's 10–Qs for the fiscal quarters ended June 30, September 30, and December 31, 1977 through 1982; ADC's 10–Ks for the fiscal years ended December 31, 1976 through 1983; and ADC's 10–Qs for the fiscal quarters ended March 31, June 30, and September 30, 1976 through 1982, and for the quarter ended March 31, 1983.

the quarters ended March 31, June 30, and September 30, 1976 through 1982, and 10–Qs for the quarters ended March 31, and June 30, 1982.[3] DGC did not file any 10–Qs until July 18, 1983.

On July 18, 1983, counsel for the SEC telephoned counsel for DGC, ADC, and Fitzgerald to advise them that the documents submitted were deficient. On July 19, 1983, counsel for the SEC wrote a follow-up letter advising the defendants that although a thorough review had not yet been completed, a preliminary examination showed that the 10–Ks were deficient for their failure to include audited financial statements, and that further deficiencies might surface. The letter also advised the defendants that it was the position of the SEC that neither the June 20 Order nor the Injunction had been complied with and that the $1,000 per day fines were running. The SEC received no response.

On September 9, 1983, EEC filed its own motion to hold DGC, ADC, and Fitzgerald in contempt and to impose sanctions for their failure to provide EEC the corporate records specified in the Injunction.

On September 19, 1983, the SEC, taking the position that the July 15 filings did not comply with the Court's orders, moved to enforce the June 20 Order. The motion sought, *inter alia*, an order reducing the fines to judgment and an order permitting the SEC to execute against Mr. Fitzgerald's assets and/or property.

On November 1, 1983, the parties appeared before the Court to announce a tentative settlement. The parties, with Mr. Fitzgerald present, represented to the Court that a settlement had been reached, and that the only unresolved matter was

agreement on the name (but not the concept) of a special agent to examine the defendants' books and prepare the delinquent reports. It is the unrebutted[4] assertion of the SEC that on November 16, 1983, defendants advised the SEC that one of the suggested candidates was acceptable. However, on November 17, 1983, Mr. Fitzgerald refused to sign the settlement. *See* Plaintiff's Motion for Oral Argument at 3, and transcript of the December 5, 1983 hearing ("Transcript") at 55–56.

Oral argument on the SEC's and Eastern's motions was set down for December 5, 1983. Approximately eight minutes before the hearing, counsel for Fitzgerald filed an affidavit in opposition to Eastern's September 9 motion for contempt. This was the first time Fitzgerald had responded to Eastern's motion. In addition, Fitzgerald submitted a motion for relief from findings, orders, and judgment of the Court, arguing lack of personal jurisdiction[5], and amendments to the July 15 filings. The Court heard oral argument on all three motions and took under advisement the SEC's and Fitzgerald's motions. With regard to Eastern's motion, the Court ruled from the bench that since the motion had not been responded to in timely fashion, the motion would be deemed conceded pursuant to the Local Rules. Transcript at 57.

*The Motions*

A. *Eastern's Motion*

Local Rule 1–9(d) provides that if an opposing statement to a motion is not filed within the prescribed time—thirteen days if the motion was mailed—the court may treat the motion as conceded. In this case, the opposition was filed nearly three

---

**3.** The cover letter to these documents stated that ADC 10–Qs for the quarters ended September 30, 1982 and March 31, 1983 were also included. The SEC asserts, however, that it never received these reports.

**4.** Indeed Mr. Cook, counsel for the corporations and formerly counsel for Mr. Fitzgerald as well, was given an opportunity to respond to this

statement of the events and declined to do so. Transcript at 56.

**5.** Accompanying the motion was a document purporting to withdraw Fitzgerald's prior admission to the jurisdiction of the Court and his prior consent to the findings of contempt and Order of June 20, 1983. Supplemental affida-

months late.[6] No excuse for this delay has been offered. Accordingly, the Court holds by its earlier ruling and deems the motion conceded.

■ In his opposition to Eastern's motion, Fitzgerald asserts that all of EEC's documents have been turned over to EEC and therefore that there has been compliance with the Injunction. The Court is unpersuaded. Counsel for EEC has pointed out to the Court that Fitzgerald has made this same assertion several times in the past in response to document requests and subsequently found the requested documents to exist. More significantly, counsel for EEC has argued that certain financial statements contained in a settlement disclosure in a prior action involving the defendants could not have been made without EEC documents which EEC has not received. Transcript at 52–54. This argument has not been rebutted by defendants.

For the foregoing reasons Eastern's motion is granted. DGC, ADC, and Fitzgerald are hereby found in contempt for failing to furnish records to EEC as required by this Court's Injunction. Compensatory and coercive sanctions have been imposed according to terms set forth in the Order accompanying this Memorandum.

### B. *Fitzgerald's Motion*

■ Fitzgerald has made a motion for relief from this Court's June 20 Order, November 2, 1983 Order[7], and Judgment of Permanent Injunction. The motion is accompanied by a document entitled "Withdrawal of Admission to the Jurisdiction of this Court and Withdrawal of Consent to Findings and Order of June 20, 1983". The basis for the motion is that the Court lacks personal jurisdiction over Mr. Fitzgerald. Fitzgerald argues that he is not a party to

vits in opposition to the SEC's motion were also submitted.

**6.** Eastern's motion was filed on September 9, 1983. Fitzgerald's affidavit in opposition was not filed until December 5, 1983.

the lawsuit and was not served with a copy of the complaint, summons, or injunction.

Simply put, Fitzgerald's motion is frivolous and factually incorrect. The SEC has provided the Court with copies of the U.S. Marshals Process Receipt and Return which show that Mr. Fitzgerald was personally served with a copy of the summons and complaint on January 27, 1981. Fitzgerald's own consent, dated June 18, 1983, acknowledges receipt of the Injunction.

Fitzgerald's argument that the Court lacks personal jurisdiction over him, and his attempt to withdraw his consent to the jurisdiction of this Court and to the entry of prior orders are both unavailing. Fed.R. Civ.P. 65(d) provides that "[e]very order granting an injunction ... is binding only upon the parties to the action, *their officers*, agents, servants, employees, and attorneys, and *upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise*" (emphasis added). *See also Wilson v. United States*, 221 U.S. 361, 376, 31 S.Ct. 538, 542, 55 L.Ed. 771 (1911); *SEC v. VTR, Inc.*, 410 F.Supp. 1309, 1314 (D.D.C.1975); *U.S. v. Greyhound Corp.*, 363 F.Supp. 525, 571 (N.D. Ill.), *aff'd*, 508 F.2d 529 (7th Cir.1974). Fitzgerald was an officer of the defendant corporations—Chief Executive Officer and Chairman of the board—and received notice of the Injunction.

Moreover, Fitzgerald expressly consented to the personal jurisdiction of the Court over him. The "Consent of Thomas C. Fitzgerald, Jr. to Findings of Civil contempt and Order Imposing Fines" (signed by Fitzgerald) states at paragraph 3: "Fitzgerald admits to the jurisdiction of this Court over him and over the subject matter of this action". The language of this consent is unequivocal.[8]

**7.** The Court is unable to determine which order Fitzgerald is referring to as no November 2 Order was entered.

**8.** In addition, Fitzgerald's lengthy participation in this lawsuit, without once raising this objection, has conferred personal jurisdiction on the Court.

Fitzgerald is himself a lawyer. He has been at all times pertinent to this motion represented by counsel.[9] He voluntarily, knowingly, and expressly consented to the jurisdiction of this Court over him, to the finding of contempt, and to the imposition of fines. Transcript at 57. Mr. Fitzgerald's motion is merely the latest in a long line of frivolous attempts to delay and avoid the inevitable: contempt, sanctions, and inquiry into the affairs of the corporations he managed. The motion is denied.

## C. *SEC's Motion*

The SEC has filed a Motion for a Judgment Against Thomas C. Fitzgerald, Jr. Assessing Fines Previously Imposed for Failure to Comply with this Court's Judgment of Permanent Injunction. The SEC alleges that although DGC and ADC did submit some filings purporting to be 10–Ks and 10–Qs on July 15, 1983, the filings were so materially deficient that they did not comply with the SEC's Rules and Regulations or the Court's June 20 Order. The SEC requests, *inter alia,* that the coercive fines specified in the June 20 Order be assessed against Mr. Fitzgerald and that a money judgment in the amount of the fines be entered for execution against Fitzgerald's property and/or assets. In addition, the SEC has requested that a special agent be appointed to prepare and complete accurate filings for DGC and ADC.

Mr. Fitzgerald expressly consented to the June 20 Order finding him and the parties in civil contempt and imposing fines on him personally should DGC and ADC fail to make the requisite filings by July 15, 1983. Consequently, there is no issue as to whether Fitzgerald is in contempt. The only issues are: (1) whether the July 15 filings complied with the June 20 Order and (2) if not, whether the December 5, 1983 amendments rectified the problem. After careful review of the SEC's pleadings, their lengthy and well-documented declarations

of the specific deficiencies, the opposing papers, the Court's own review of the filings, and the entire record herein, the Court concludes that neither the July 15 nor the December 5 filings complied with the June 20 Order.

### (i) *The July 15 Filings*

The SEC does not allege a few, superficial deficiencies. Rather it cites a host of omissions, mistakes, and inconsistencies which are so fundamental that the filings are rendered virtually useless as reporting and disclosure documents.[10]

■ Foremost in the deficiencies cited is the lack of adequate financial statements. First, DGC's and ADC's 10–Ks fail to contain audited financial statements as required by Regulation S–X, 17 CFR § 210.1–01 *et seq.* Indeed the 10–Ks contain no financial statements as such. Certain financial statements are included in the 10–Qs. However, there is no cross-reference in the 10–Ks to direct the reader to the 10–Qs and, more critically, the financials in the 10–Qs are not audited as is required for 10–Ks. 17 CFR § 210.3–01 *et seq.*

The failure to provide audited financial statements is not a mere technical matter. As the court stated in *SEC v. Beisinger Industries Corp.,* 421 F.Supp. 691, 694–95 (D.Mass.1976), *aff'd,* 552 F.2d 15 (1st Cir. 1977) (citations omitted):

it is also clear that the registrant's annual reports were inadequate to meet the periodic reporting requirements because of their failure to provide fully audited financial statements. These were not mere technical deficiencies but rather were serious violations of the periodic reporting requirements. The failures to provide timely reports and adequate financial information are offensive to the central purpose of the periodic reporting system Congress established through the Exchange Act. For the system to work

---

**9.** Counsel for Fitzgerald stated at the December 5 hearing that Fitzgerald was not represented by counsel when he signed the consent. The Court's records belie this assertion. *See* Transcript at 57.

**10.** In addition to the deficiencies in the reports filed, it is conceded that DGC failed to file any of its 10–Qs until July 18, 1983, three days late.

properly the information reported must be both current and adequate.

▆ Defendants argue that they are relieved of the requirement of furnishing audited financials by 17 CFR § 210.3–11 which exempts "inactive entities", and by 17 CFR § 240.12b–21 which creates an exemption where there would be "unreasonable effort or expense". Both exemptions are inapplicable.

In order to claim the exemption as an "inactive entity", expenditures for all purposes for a fiscal year must not have exceeded $100,000. § 210.3–11(c). The financial information which was provided by ADC indicates that ADC had general and administrative expenses in excess of $100,-000 in 1975, 1976, 1979, 1980, 1981 and 1982. In addition, to qualify as an inactive entity there must have been no material change in the business of the company, § 210.3–11(d). An affidavit submitted by Mr. Fitzgerald for other purposes states that "[a]s the regular accountant doing in-house work was experienced in life insurance accounting, but not in oil and gas, *as the nature of DGC's and ADC's business changed,* the independent CPA ... was more and more called upon to contribute to the accounting effort" [11]. In addition, during the years in question EEC was divested by DGC and ADC, the insurance assets were sold or disposed of in large part, and the corporations moved into the oil and gas business [12].

It is true that Fitzgerald has submitted affidavits stating that there have been no material changes and that the companies are inactive. His declarations, however, are conclusory, unsupported by any proof whatsoever, and contrary to the evidence found in Fitzgerald's own papers. Clearly neither DGC nor ADC meets the test of an inactive company for purposes of § 210.3–11.

Defendants' second argument, that they are exempt from filing audited financials because of the "unreasonable effort or expense" involved, is similarly without merit. Subparagraph (b) to § 240.12b–21 states that this exemption may be claimed only if the registrant includes a statement showing what unreasonable effort or expense would be involved. This is an express precondition to claiming this exemption. No such statement was included in the filings. Even in their pleadings defendants have given no account of the expenses or effort that would be involved other than the most general and unspecific statements. Moreover, the SEC permits the filing of unaudited financials only in the most unusual circumstances. *See* SEC Release No. 34–9660, June 30, 1972. In conclusion, neither DGC nor ADC are exempt from filing audited financials.

The failure to provide audited financials is so material that even if this were the only problem it would render the filings inadequate for purposes of the June 20 Order. *See SEC v. Beisinger Industries Corp., supra.* But in fact the deficiencies do not end here. With regard to the 10–Ks, almost every item is incomplete and superficial. The business discussion, particularly the discussion of the oil and gas operations, is incomplete and does not comply with § 229.101. Item 3 of the 10–Ks (properties) contains only a one sentence discussion of the lease of the executive offices of the companies. There is no discussion in this section of the oil and gas properties despite the explicit instructions in § 229.102 that such be included, and in spite of the fact that such properties appear to constitute the principal assets of the companies [13]. Item 5 (legal proceedings) omits any mention of this lawsuit which has been pending since 1981. While 17 CFR § 229.303 calls for a thorough discussion and analysis of the results of operations, liquidity, and capital resources in

---

**11.** *See* Opposition to Plaintiff's Motion for a Judgment Against Thomas C. Fitzgerald ("Opposition"), Exhibit C, ¶ (8).

**12.** *See* Transcript at 5.

**13.** The 1982 Balance Sheet shows that in that year oil and gas holdings comprised $2.5 million of $3.2 million total assets.

the Management Discussion and Analysis Section, ADC's 10–Ks only provide one sentence expressing a decrease in general and administrative expenses. Even this one sentence fails to provide any meaningful explanation for the decrease. Finally, the documents were not even signed by all the proper officers and directors as required by General Instruction D to Form 10–K. This list of deficiencies is not exhaustive.

In addition to the aforementioned omissions and lack of information, the filings are replete with inconsistencies, typographical errors, and misinformation. To mention only a few: the 10–Ks state that certain financial statements and an accountant's report are included when they are not (see Item 10 of the 10–Ks); the first sentence of DGC's 1983 10–K Summary of Operations section states "[t]he preceding pages [plural] present a *thirteen* year consolidated summary of earnings (loss) to the Registrant", when in fact the preceding page [singular] only goes back *seven* years; the financial statements in ADC's 10–Ks have the brackets which represent losses in the wrong places so that the statements indicate a profit where there should be a loss and vice versa; the ADC 1982 10–K lists Fitzgerald as being 58 years old in Item 8 but 57 years old in Item 12; Item 6 of ADC's 1982 10–K lists the number of shares of Class A Common Stock outstanding for 1974 as 3,540,625 while Item 6 of ADC's 1981 10–K puts the number for 1974 at 3,540,625; the cover page to ADC's 10–Ks states that the common stock has no par, yet Item 6 notes a par value of 10 cents and 1 cent; the business discussion in DGC's 1983 10–K is *identical* to the discussion in DGC's 1982 10–K and to the oil and gas discussion in *ADC's* 1981 10–K; and finally, the general and administrative expenses are reported as being $36,000 for 1977 through 1983, i.e. no change whatsoever.

The inconsistencies and misinformation not only render the reports useless for reporting and disclosure purposes, but also reveal an almost willful lack of attention and diligence in the preparation of the filings. Indeed it is hard to imagine that the filings are the product of two years of concentrated work as Fitzgerald has contended. Moreover, these errors, which have been discovered only where an inconsistent piece of information happened to be noticed, make the Court—and the investor—question the accuracy of the entire report.

■ As with the 10–Ks, the purported 10–Qs are materially deficient. First, the financial statements do not contain quarterly comparisons as is required by 17 CFR § 210.10–01. In addition, the financial statements contain footnote references which do not exist. For example, note 3 to ADC's financials refers to a note 9 which does not exist. No financials for Jackson Life were contained in the July 15 filings.

The SEC's allegations are amply supported by detailed Declarations. The Court's own review of the July 15 filings confirms that they are wholly inadequate. Moreover, except for the allegations of unaudited financials, defendants have not specifically responded to any of the detailed allegations. Rather, defendants have made blanket statements that: (1) the filings were adequate for a first time filing [14]; (2) the accepted practice with periodic filings is for the registrant to submit, the SEC to comment, and the registrant to respond [15]; and (3) the Court's Injunction did not specify certified financials or letter perfect filings [16]. These arguments are without merit. First, the filings were not adequate for a first time filing; second, it is not and should not be the accepted practice for the SEC to accept "bed-bug" material and make corrections—especially when a company has been delinquent in its reporting obligations for seven years and is under both an injunction and a contempt order. Finally, the Court's Injunction Order meant filings which would substantial-

---

**14.** *See* Opposition at 4.

**15.** *Id.* at 5–6.

**16.** *See* Transcript at 28.

ly comply with the SEC's Rules and Regulations. Any other interpretation would ignore the purposes of the Injunction and the reporting and disclosure purposes of periodic filings.

### (ii) *The December 5 Filings*

■ The only issue remaining is whether the December 5 amendments corrected the deficiencies in the July 15 filings. After careful consideration of the detailed declarations of the SEC [17] the statements of SEC counsel in Court [18], and the Court's own review of the documents, the Court holds that the December 5, 1983 filings are materially deficient and do not come close to correcting the deficiencies in the July 15 filings. Many of the deficiencies which were noted in the SEC's September 19 motion remain uncorrected and unaddressed. Mr. Fitzgerald's statement that the corrective filings address themselves to the specific comments made in the SEC affidavits is patently incorrect [19]. In addition there has been no response to the SEC's Declarations which list the deficiencies in the December 5 filings. Because the allegations of the deficiencies have not been responded to, they should be deemed conceded under Local rule 1–9(d).

### (iii) *Relief*

Having concluded that the July 15, 1983 filings did not comply with the June 20 Order, the Court assesses fines of $1,000 per day from July 16, 1983 through December 5, 1983. This amounts to 143 days and $143,000. Judgment in this amount for execution against Mr. Fitzgerald's assets and/or property is granted.

■ Having concluded that the December 5 filings did not comply with the June 20 Order or correct the July 15 filings, the fines should still be running. The Court, however, will not penalize Mr. Fitzgerald for the time taken by the Court to resolve the matter [20]. Accordingly, the Court will not, *at this time,* assess fines after December 5, 1983. The Court notes, however, that DGC, ADC, and Fitzgerald are still in contempt and not in compliance with the Injunction or the June 20 Order.

■ In addition to the assessment of coercive fines, the Court grants the SEC's request for the appointment of a special agent to review the books of DGC, ADC, and Fitzgerald, to prepare and file the delinquent reports, and to take any other action in furtherance of these tasks. The appointment of a special agent is necessitated at this point not only by the failure of defendants to comply with the June 20 Order, not only by their failure to file for the last seven years, but also by defendants' *continued* inability to file timely reports. Even as Fitzgerald has been arguing that DGC and ADC have complied, DGC and ADC continue to file out of time. The June 30, 1983 10–Qs, which were due August 15, 1983, and the September 30, 1983 10–Qs due November 15, 1983, were not filed until December 5, 1983. As of February 17, 1984 DGC had not filed its December 31, 1983 10–Q. Clearly the appointment of a special agent is in order. *See SEC v. Beisinger Industries Corp., supra.*

The special agent and any other personnel employed by him or her will be compensated out of the fines assessed. In addition, Mr. Fitzgerald will be required to compensate the SEC, the special agent, and any other personnel, for fees and expenses which exceed the amount of the fines assessed. Mr. Fitzgerald is required to cooperate fully with the SEC and the special agent. Any further contumacy will result in the further assessment of coercive civil fines of $1,000 per day until compliance. Fitzgerald is further admonished to heed

---

**17.** *See* Supplemental Memorandum in Support of Motion for a Judgment Against Thomas C. Fitzgerald, filed December 19, 1983.

**18.** *See* Transcript at 3, 6, 9, and 14.

**19.** *See* Supplemental Affidavit of Thomas C. Fitzgerald, Jr., filed December 5, 1983.

**20.** The Court does, however, have serious doubts as to the good faith of Mr. Fitzgerald's motion and the December 5 filings.

the provisions of the Permanent Injunction requiring him to cause ADC and DGC to file timely *and adequate* periodic reports in the future.

Finally, Fitzgerald will be required to compensate the SEC for their costs and counsel fees incurred as a result of the contempt.

. An Order consistent with this Memorandum has been entered.

## ON MOTION FOR ORDER OF CONTEMPT

This matter comes before the Court on a motion of the Securities and Exchange Commission (SEC) to hold Thomas C. Fitzgerald, Jr. (Fitzgerald) in civil contempt for his refusal to obey an April 9 Order of this Court. On June 18, 1983, Fitzgerald consented in writing to a finding of civil contempt and the entry of an order which provided for the imposition of coercive fines of $1,000 per day should he fail to comply with a previously entered injunction. On April 9, 1984, this Court entered a Memorandum and Order (April 9 Order) finding that Fitzgerald had not complied with the prior injunction and orders. Pursuant to the June 18 consent, the Court assessed accrued fines of $143,000. The April 9 Order required Fitzgerald to pay these fines into the registry of the Court. Fitzgerald has refused to pay the fines or otherwise obey the April 9 Order. In order to coerce Fitzgerald to comply with the April 9 Order and pay the $143,000, the SEC requests the Court to hold Fitzgerald in civil contempt and order him committed until he complies.

After careful consideration of the motion, the opposition thereto, and the arguments of counsel for both sides at a hearing to show cause, the Court concludes that Fitzgerald has not obeyed the April 9 Order, has expressly refused to plead inability to comply, and has raised no legally sufficient excuse for his noncompliance. The Court also concludes, after review of the relevant statutory and common law, that it

has the power to grant the relief requested. Accordingly, Fitzgerald is hereby held in civil contempt for refusing to obey the April 9 Order and is ordered committed until he purges himself of the contempt by paying the $143,000 into the registry of the Court.

### Background

A review of the history of this action reveals a steady pattern of delay, avoidance, and refusal to comply. In January, 1981, the SEC commenced this action against three corporations run by Fitzgerald for their failure to file annual (10–K) and quarterly (10–Q) reports[1]. In some cases the failure to file went as far back as 1976. On June 8, 1983, this Court entered a Permanent Injunction (Injunction) against the corporations. The Injunction ordered two of the corporations, *inter alia*, to file their delinquent reports by June 10, 1983. The corporations failed to comply. On June 18, 1983, after negotiating with the SEC's staff, the two corporations in question and *Fitzgerald himself* consented to findings of civil contempt and the entry of an order which provided that: (a) the delinquent reports would be filed by July 15, 1983; and (b) in the event the reports were not filed by that date, coercive fines of $1,000 per day would be assessed against Fitzgerald personally until the reports were filed. Fitzgerald's consent was unambiguous and in writing.

On July 15, 1983, the corporations filed some documents purporting to comply with the Court's orders. Additional documents were filed on July 18, 1983, and again on December 5, 1983. The documents were shams. *See* April 9 Memorandum. Accordingly, on April 9, 1984, this Court ordered, *inter alia*, that Fitzgerald pay $143,000 in accrued fines into the registry of the Court and further ordered that a special agent be appointed to examine the books of the corporations and prepare their periodic reports. The Order intended that the fines would be used to fund the special agent.

**1.** For a more detailed history of this action, see     the April 9 Memorandum of this Court.

Fitzgerald took an appeal from the April 9 Order [2] but did not request a stay [3]. Nonetheless, Fitzgerald has refused to pay the $143,000 as ordered. The SEC attempted to depose Fitzgerald for the purpose of executing against his assets. Fitzgerald, however, refused to answer all questions relating to his assets on Fifth Amendment grounds [4,5]. Only at this point did the SEC make the instant motion to hold Fitzgerald in contempt and have him committed until he pays the $143,000.

On June 22, 1984, the Court issued an order directing Fitzgerald to show cause why he should not be held in civil contempt and imprisoned for his failure to obey the April 9 Order. Fitzgerald first moved for reconsideration of the issuance of the show cause order, which motion the Court rejected. On July 18, 1984, this Court held a full hearing.

*Fitzgerald's Opposition*

Fitzgerald opposes the motion to find him in contempt and imprison him until he complies with the April 9 Order on three grounds:

1. The appeal of the April 9 Order divested this Court of jurisdiction.

2. The remedy sought by the SEC would violate Fitzgerald's Fifth Amendment Due Process rights.

3. Civil Contempt and imprisonment may not be used to enforce payment of a money judgment; such action would amount to imprisonment for debt.

The Court will address each of these points in turn.

1. *The District Court's Jurisdiction Pending Appeal*

▮▮▮ Fitzgerald argues that the appeal of the April 9 Order divested the Court of jurisdiction to take any further action regarding matters on appeal except to aid the appeal or correct clerical errors. The Court has already rejected this argument. *See* July 17, 1984 Memorandum Order. Where no stay pending appeal has been granted the district court retains the power to enforce its judgment and to take steps in aid of execution. *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 928 (5th Cir.1983); *Farmhand, Inc. v. Anel Engineering Industries,* 693 F.2d 1140, 1146 (5th Cir.1982); *Deering Milliken, Inc. v. F.T.C.,* 647 F.2d 1124, 1129 (D.C.Cir. 1978); *International Paper Co. v. Whitson,* 595 F.2d 559, 562 (10th Cir.1979); 9 Moore's Federal Practice ¶¶ 203.11 & 208.-03 (2d ed. 1983). A primary means of enforcing its unstayed judgment is contempt. *Farmhand, Inc. v. Anel Engineering Industries,* 693 F.2d at 1146; *Brown v. Braddick,* 595 F.2d 961, 965 (5th Cir.1979); *Gullet v. Gullet,* 174 F.2d 531, 533 (D.C. Cir.1949). The cases cited by Fitzgerald are wholly inapposite as they involved action by the district court which was not for the purpose of enforcing an unstayed judgment, aiding execution, aiding the appeal, or correcting clerical errors.

2. *Fitzgerald's Fifth Amendment-Due Process Rights*

▮▮▮ Fitzgerald next argues that the remedy sought here would "deprive [him] of his liberty and property without due process of law" in contravention of the Fifth Amendment. Fitzgerald's argument is as follows: (1) the original complaint in this case did not name Fitzgerald as a party but only named the corporations as party defendants; (2) although Fitzgerald was personally served with a copy of the complaint and summons (which sought an injunction against the officers of the corporations as well as against the corporations), Fitzgerald was never served with a complaint in which he was named a party de-

---

**2.** The appeal is pending as of the date of this Memorandum Order.

**3.** At the show cause hearing counsel for Fitzgerald indicated that the failure to seek a stay was intentional and not an oversight.

**4.** The Court has not been asked to rule on the validity of Fitzgerald's invocation of the Fifth Amendment.

**5.** As an interesting aside, on the day of the deposition, Fitzgerald caused the corporations to file for bankruptcy in the hopes of staying this action. *See* June 8, 1984 Order.

fendant; (3) a court may not render a judgment of any sort against a person not named and served as a formal party; (4) as such, the prior judgments of this court against Fitzgerald are void; (5) contempt cannot be predicated on a void judgment; (6) therefore, any contempt involving fines or imprisonment would cause a deprivation of liberty and property without due process.

This is essentially a rehash, with a Fifth Amendment twist, of an earlier argument Fitzgerald made in his opposition to the motion to assess fines. *See* Motion of Thomas C. Fitzgerald, Jr. for Relief from Findings, Orders and Judgments of this Court filed December 5, 1983. In the April 9 Memorandum, the Court dismissed this argument as frivolous. *See* April 9 Memorandum at 6–8. The argument has not acquired any new merit in the intervening four months. Indeed, this Circuit has recently rejected an identical argument under probably even less persuasive facts. *See Securities & Exchange Commission v. Ormont Drug & Chemical Company, Inc.,* 739 F.2d 654, 656 n. 4 (D.C.Cir.1984).

In the case at bar, the complaint sought an injunction against the officers of the corporations. *See* complaint at 11. Fitzgerald was personally served with a copy of the summons and complaint. His own consent dated June 18, 1983, acknowledges receipt of the Injunction which was directed at him as well as the corporations. He has actively participated through counsel in every facet of this case since 1981. He has never denied, nor could he, adequate notice and actual knowledge of every motion and proceeding in this action. He personally consented to the contempt order and expressly consented to the personal jurisdiction of this Court over him. *See* April 9 Memorandum at 6–8. In conclusion, Fitzgerald was for all intents and purposes a party to this action. Service was more than adequate for notice and jurisdiction.

### 3. *Power of this Court to Order Confinement to Compel Obedience to the April 9 Order.*

Fitzgerald's final argument is that the Court may not order his committed for contempt of the April 9 Order which ordered him to pay $143,000 into the registry of the Court. Fitzgerald argues that such a measure would amount to imprisonment for debt in violation of 28 U.S.C. § 2007(a), D.C.Code § 15–320(c), and the common law. The Court rejects Fitzgerald's argument and holds that civil contempt fines are not "debts" for purposes of 28 U.S.C. § 2007(a), and that confinement until such fines are paid is not "imprisonment for debt". D.C.Code § 15–320(c) is therefore not applicable. The three common law cases cited by Fitzgerald are not controlling, not persuasive, and not on point.

The starting point for such an argument is 28 U.S.C. § 2007(a). The statute provides that:

A person shall not be imprisoned for debt on a writ of execution or other process issued from a court of the United States in any State wherein imprisonment for debt has been abolished. All modifications, conditions, and restrictions upon such imprisonment provided by State law shall apply to any writ of execution or process issued from a court of the United States in accordance with the procedure applicable in such State.

In other words, federal courts are instructed to follow state law to determine when and to what extent imprisonment for debt is permitted. However, whether an obligation to pay constitutes a "debt", and whether confinement to compel payment amounts to "imprisonment for debt" is a matter of federal law [6]. Only if the obligations are "debts" and the confinement "imprisonment for debt" within the meaning of 28 U.S.C. § 2007(a) do we turn to state law.

The overwhelming weight of authority holds that civil contempt fines are not debts, and that confinement to coerce pay-

---

**6.** Fitzgerald contends that D.C.Code § 15–320(a) makes Section 320(c) applicable to the federal district courts. The Court thinks Fitzgerald's counsel misreads the statute. The language of the statute only makes Section (a) applicable to the District Court.

ment of previously assessed contempt fines is not imprisonment for debt. These courts sanction the practice as being within a court's civil contempt power to coerce obedience to a lawful order. *See Oriel v. Russell,* 278 U.S. 358, 366, 49 S.Ct. 173, 175, 73 L.Ed. 419 (1928). *SEC v. Moss,* 644 F.2d 313, 316 (4th Cir.1981); *Usery v. Fisher,* 565 F.2d 137, 139–40 (10th Cir.1977); *Atlas Corporation v. DeVilliers,* 447 F.2d 799, 803 (10th Cir.1971); *Parker v. United States,* 153 F.2d 66, 70–71 (1st Cir.1936); *Parker v. United States,* 126 F.2d 370, 380 (1st Cir.1942); *Raymor Ballroom Co. v. Buck,* 110 F.2d 207, 210–12 (1st Cir.1940); *Cutting v. Van Fleet,* 252 F. 100, 101–02 (9th Cir.1918); *In re Mann,* 126 F.Supp. 709, 710 (D.Mass.1954); 17 Am.Jur.2d, Contempt, § 112, p. 98; 16A Am.Jur.2d, Constitutional Law, §§ 619–620, pp. 569–71; 31 ALR 3d 926, 930; Note, *Imprisonment for Nonpayment of Fines and Costs: A New Look at the Laws and the Constitution,* 22 Vand.L.Rev. 611, 620, 640–41 (1969). As the Supreme Court stated in *Oriel v. Russell,* 278 U.S. at 366, 49 S.Ct. at 175:

> Actual or virtual imprisonment for debt has ceased, but imprisonment to compel obedience to a lawful judicial order (if it appear that obedience is being willfully refused) has not yet ceased and ought not to cease, unless it should be thought expedient to destroy all respect for the courts by stripping them of power to enforce their lawful decrees.

The civil contempt fines in this case are not debts or money judgments in the usual sense of the words. A contempt order committing Fitzgerald for the purpose of compelling compliance to the April 9 Order would be primarily just that—an order to compel compliance with a lawful order of the court—and only secondarily an order to compel payment of a money judgment. This is within the Court's contempt power. To conclude that a court may not order

commitment to enforce its lawful orders would be to render a court powerless to vindicate its authority in many situations.

Nor is execution a viable or appropriate alternative in this case. First, as a general principle, it flies in the face of fairness and justice to require the party injured by the contempt and disobedience to spend years and countless dollars trying to execute on the contemnor's assets. Such a result seems particularly wrong where, as here, the contemnor has stonewalled execution by refusing to answer questions at deposition and by possibly transferring assets out of his name[7]. The Court rejects Fitzgerald's last argument.

*Conclusion*

▇ Fitzgerald has raised no legally sufficient defense to the relief requested here. It is undisputed that he has refused to pay the $143,000. The Order requiring him to pay remains unstayed. The Court went to great lengths to question Fitzgerald's counsel as to Fitzgerald's ability to comply with the April 9 Order since Fitzgerald did not raise this as a defense[8]. The Court was told that Fitzgerald was aware that he could make such an assertion and had decided not to do so. *See* transcript at 13–16. Accordingly, the Court must conclude that Fitzgerald is able to comply but refuses to do so[9].

▇ Imprisonment should be a sanction of last resort. We have reached that point in this case. For the foregoing reasons Thomas C. Fitzgerald, Jr. is hereby found in civil contempt of this Court's April 9, 1984 Order. Fitzgerald is ordered to pay the sum of $143,000 into the registry of this Court by 4:00 p.m. September 21, 1984. Should Fitzgerald fail to comply with this order by that date, Fitzgerald is ordered to report to the United States Courthouse for the District of Columbia, Courtroom 17, at

---

**7.** *See* transcript of the July 18, 1984 hearing ("transcript") at 32.

**8.** The burden of raising and proving an impossibility defense lies with Fitzgerald. *See S.E.C. v. Ormont,* 739 F.2d 654, 657 n. 7 (D.C.Cir.1984).

**9.** With regard to Fitzgerald's financial ability to comply, the Court notes that while Fitzgerald has caused the corporations which he manages to file for bankruptcy, Fitzgerald has not similarly availed himself of the bankruptcy laws.

10:00 a.m. on September 25, 1984 for commitment until he purges himself of the contempt by complying with the April 9 Order.

Fitzgerald is further ordered to compensate the SEC for their costs and fees incurred as a result of this contempt. The SEC shall submit an accounting to the Court for the Court's approval.

So Ordered.